UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | X | |
| PAULO TRINDADE | : | Civil Action No. |
| | : | 1:19-cv-10717-ADB |
| Plaintiff, | : | |
| | : | |
| v. | : | DEFENDANTS' PROPOSED |
| | : | FINDINGS OF FACT AND |
| GROVE SERVICES, INC. and VICTOR SPIVAK | : | CONCLUSIONS OF LAW |
| | : | |
| Defendants. | : | |
| | : | |
| | X | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

PROPOSED FINDINGS OF FACT .............................................................................................. 2

    Mr. Trindade's Terms of Employment ....................................................................................... 3

    Overhead Allocation .................................................................................................................. 5

    Interest and Return on Capital Investment Allocation ............................................................. 5

    The 401(k) Payments ................................................................................................................. 6

    The 2016 Commission Plan ....................................................................................................... 6

    Grove Payment to Mr. Trindade of 2014 Commissions ........................................................... 6

    Grove Estimated That Mr. Trindade Was Due No Commission for 2015 ................................. 7

    Grove Paid Mr. Trindade More Than The Commissions Due Him for 2016 ........................... 8

    Mr. Trindade Resigned from Grove and Commenced this Action ............................................ 8

PROPOSED CONCLUSIONS OF LAW ....................................................................................... 9

    A.    Mr. Trindade Failed to Prove That Grove Materially Breached the Agreement ........... 9

    1.    Mr. Trindade Failed to Prove That Grove Underpaid His 2014 Commissions ............. 9

    2.    Mr. Trindade Failed To Establish Damages for 2016 Commission Payments .............. 12

    Was Grove's Classification of Costs and Revenues from Affiliates Unreasonable? ................ 15

    Was Grove's Use of the Gross Profits Method To Allocate Overhead Unreasonable? ........... 18

    Was Grove's Cost of Capital Classifications Reasonable? ...................................................... 20

    Mr. Trindade Did Not Prove That Any Commissions Were Due To Him For 2015 ................ 23

    B.    The Wage Act Claims Are Also Time-Barred ............................................................... 25

CONCLUSION ............................................................................................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Albertini v. Summit Tech. Servs., Inc*., 287 F. Supp. 2d 92 (D. Mass. 2003) ...................................................18

*Atlantic Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541 (1st Cir. 1993) .............................................20, 22

*Barkhordar v. President & Fellows of Harvard Coll*., 544 F. Supp. 3d 203 (D. Mass. 2021) ........................9

*Den Norske Bank AS v. First Nat. Bank of Bos., N.A* ., 838 F. Supp. 19 (D. Mass. 1993) ..............................16

*Dickey v. Nat'l Football League*, No. 17-CV-12295-IT, 2018 WL 4623061 (D. Mass. Sept. 26, 2018), *aff'd*, No. 19-1097, 2020 WL 6819135 (1st Cir. Feb. 13, 2020).........................................................................................8

*Dunkin' Donuts Inc. v. Gav-Stra Donuts, Inc*., 139 F. Supp. 2d 147 (D. Mass. 2001) .....................................9

*Fishman v. LaSalle Nat. Bank*, 247 F.3d 300 (1st Cir. 2001) .........................................................................16

*Four Corners Serv. Station, Inc. v. Mobil Oil Corp*., 51 F.3d 306 (1st Cir. 1995) .....................................12, 13

*Gemini Invs. Inc. v. AmeriPark, Inc*., 643 F.3d 43 (1st Cir. 2011) ...................................................................9

*Haven Real Est. Grp., LLC v. Bell Atl. Mobile of Massachusetts Corp., Ltd*., 236 F. Supp. 3d 454 (D. Mass. 2017) 22

*United States v. Organon USA Inc*., No. CV 07-12153-RWZ, 2015 WL 10002943 (D. Mass. Aug. 17, 2015).........23

*Weber v. Cmty. Teamwork, Inc*., 434 Mass. 761 (2001)...........................................................................25, 26

*Wipro Ltd. v. Analog Devices, Inc*., 527 F. Supp. 3d 93 (D. Mass. 2021) .....................................................16

## Statutes

Mass. Gen. Laws Ann. ch. 149, § 150 .....................................................................................30, 31, 32, 33

## Rules

Fed. R. Civ. P. 15(c)(1)...........................................................................................................................32

Defendants Grove Services, Inc. ("Grove") and Victor Spivak respectfully submit these proposed findings of fact and conclusions of law based on the evidence adduced at trial on April 27, May 2, May 4, and May 6, 2022.

## INTRODUCTION

There are few facts in question in connection with commissions due to plaintiff Paulo Trindade for 2014, 2015 and 2016. For 2014 and 2016 Mr. Trindade admitted that he was unable to testify himself as to what commission he was entitled to and offered no expert evidence as to his entitlement for those years. Without establishing what he was owed for 2014 and 2016, Mr. Trindade failed prove that Grove underpaid his commissions, notwithstanding Grove's accounting for its deposit of 401(k) contributions into Mr. Trindade's account. Mr. Trindade failed to meet his burden of proof for those years.

For 2015, there is no dispute that Grove suffered financially due to sanctions and countersanctions arising from Russia's annexation of Crimea. Nor is there any dispute as to sales volumes or attribution of sales. Instead, the bulk of the issues are interpretive, turning on Mr. Trindade's disputes with Grove's *classification* of costs and revenue to include wholly-owned affiliates and Grove's allocation methodology for determining *proportionate amounts*, as to which Mr. Trindade's employment agreement gave Grove discretion:

> All *classifications* of costs shall be made by the Company and all calculations of *proportionate amounts* of such costs shall be made by the Company in accordance with any reasonable allocation method selected by the Company.

Trial Exh. 3 ¶ 4(d)(ii)(emphasis added).

As set forth below, Mr. Trindade failed to prove by a preponderance of the evidence that Grove's classifications and allocation methodologies were unreasonable. Indeed, for

classification of costs, there was no dispute that Grove should include revenues from all affiliates and his own expert included costs and revenues from Grove's Swiss subsidiary in his calculations, which belies Mr. Trindade's interpretation limiting costs to only the Grove US operations or its Atlanta office. On the biggest discrepancy between the experts – whether Grove was reasonable in using proportionate gross profit to allocate overhead – Mr. Trindade's expert admitted that he did not consider Grove's human resource objectives and the global nature of its commodities brokerage business in urging the Court to inflexibly adopt a net metric ton methodology even though Grove applied the gross profit measure in previous years to Mr. Trindade's benefit. On the interest calculations and return on capital investment classification, Mr. Trindade's expert admitted that he relied on Mr. Trindade's estimates as to interest and Mr. Trindade's classification of return on capital invested solely in assets immobilized in Grove's Atlanta office, even though he agreed that the contract was not so limited.

Finally, Mr. Trindade's Wage Act claims for 2015 and 2016 are barred by the statute of limitations. Indeed, Mr. Trindade admitted that he knew that he was owed commissions 60 days after the close of the year, when the commissions were due and payable, and they were not paid on time, yet he waited more than the three-year statute of limitations bring the 2015 Wage Act claim and, thereafter, waited more than another year to amend his complaint to bring the 2016 Wage Act claim. Under recent Supreme Judicial Court case law, the Wage Act claim is ripe when the commissions were due, not when Mr. Trindade realized he was allegedly underpaid commissions, and Mr. Trindade's Wage Act claims are time barred.

## PROPOSED FINDINGS OF FACT

1.      Grove Services, Inc. ("Grove") is a corporation with its usual place of business

2

in Wellesley, Massachusetts. [May 6, 2022 Trial Tr. 291:16-292:3]. Grove also had an office in Atlanta [Apr. 27, 2022 Trial Tr. 21:13-14], remote employees all over the world [May 2, 2022 Trial Tr. 201:19-25], and owned entities in Brazil, Switzerland, Hong Kong, Germany, Ukraine, and Russia. [Apr. 27, 2022 Trial Tr. 21:23-22:1].

2.       Grove acts as a broker between animal protein suppliers in the United States and elsewhere and international buyers in locations lacking protein production capacity. [May 2, 2022 Trial Tr. 202:10-19]. The company represents approximately 10% of poultry exports from the United States. [May 2, 2022 Trial Tr. 201:20-21].

Mr. Trindade's Terms of Employment

3.       On or about September 24, 2010, Mr. Trindade entered into an employment agreement (the "Agreement") with Grove. [Trial Exh. 3; Dkt. No. 93 (Statement of Undisputed Material Facts) ¶ 1]. Under the Agreement, Mr. Trindade was to receive a base salary of $130,000 and a discretionary bonus, plus an annual commission based on net profits associated with his sales less deductions specified in the Agreement. [Trial Exh. 3 ¶ 4; Dkt. No. 93 ¶ 2]. [1]

4.       The Agreement provides that Mr. Trindade would receive a commission of 15 percent of his "Net Profits" over a $150,000 sales hurdle [Trial Exh. 3 ¶ 4(d)(i); Trial Exh. 13 at 12, 14 (Mr. Trindade's expert applying sales hurdle)] which were to be calculated for each calendar year as follows:

> (a) The gross sales order amounts generated and managed by [Mr. Trindade] (tracked by the Company under [his] employee number), minus (b) the actual cost of goods sold attributable to such sales orders, minus (c) all transportation and freight charges relating to the transportation of product and all storage charges, demurrage charges, insurance and other costs and expenses directly

---

[1]       Victor Spivak would also make decisions about awarding discretionary bonuses on an employee-by-employee basis. [May 6, 2022 Trial Tr. 240:20-241:5].

relating to such sales orders, <u>minus</u> (d) a proportionate amount of the salary, bonus, benefits and other compensation paid to or on behalf of employees and consultants, including [Mr. Trindade], working out of or for the Company's Atlanta office, <u>minus</u> (e) proportionate amount of the overhead, costs and expenses of the Company's Atlanta office and a proportionate amount of the Company reasonably apportioned to the Company's Atlanta office, <u>minus</u> (f) a proportionate amount of all interest expenses (internal or external) calculated as a function of the working capital needs of the Company's Atlanta office, and <u>minus</u> (g) a proportionate amount of a fifteen percent (15%) return on the capital investment of the Company in its Atlanta office.

[Trial Exh. 3 ¶ 4(d)(ii)].

5.    Commissions were to be paid within 60 days of the end of each year.  [Trial Exh. 3, ¶ 4(d)(i)].  Grove was not able to calculate commissions until it had received bills from vendors and other financial information for the previous calendar year, usually by mid-February. [May 6, 2022 Trial Tr. 232:25-233:10].  After receiving relevant financial information, it took Grove's accountant approximately two weeks to calculate the commissions due to sales representatives.  [May 6, 2022 Trial Tr. 233:3-4].  In most years, during that time the accountant "backed out" expenses not attributable to overhead, such as expenses associated with Grove's trading securities account, investments, and real estate, as well as any expenses personally attributed to other sales representatives, such as health insurance, salaries, and travel.  [May 6, 2022 Trial Tr. 233: 23-234:14, 235:12-25, 236:1-15].

6.    Mr. Trindade was based in Atlanta [Apr 27, 2022, Trial Tr. 21:14] and his job responsibility was to sell Grove's commodities, mostly in Latin America.  [*Id.* at 20:23-25].  In performing his duties, Mr. Trindade worked with Grove personnel in other Grove offices.  [*Id.* at 22:4-11].  Mr. Trindade also utilized Grove subsidiaries in his business, including making sales through Grove's Swiss subsidiary.  [May 4, 2022 Trial Tr. 96:23-97:4].

Overhead Allocation

7.      For all relevant times prior to 2016, Grove used proportionate gross profit as the method (the "Gross Profit Method") by which it allocated corporate overhead for commission calculation purposes.  [May 6, 2022 Trial Tr. 152:7-9; 252:6].  Under the Gross Profit Method, a sales representative's contribution to Grove's gross profit determined the percentage of Grove's overhead to be allocated against that person's Net Profits.  [May 2, 2022 Trial Tr. 220:16-221:19].  The higher the representative's percentage of Grove's gross profit, the greater the proportion of Grove's overhead to be allocated against gross sales for commission calculation. [May 4, 2022 Trial Tr. 12:23-13:7].

Interest and Return on Capital Investment Allocation

8.      Grove calculated sales representatives' proportionate share of interest expense and return on capital investment as a function of its working capital needs.  [May 6, 2022 Trial Tr. 237:7-239:6, 292:12-14].  This was calculated by applying a 15 percent rate of return on the annual average aggregate equity invested by Grove.  [May 6, 2022 Trial Tr. 237:1-9].  When Grove chose to apply it, this "cost of capital" was then allocated among sales representatives based on their proportionate share of Grove' annual total net metric tons of product sold ("Net Metric Tons Method").  [May 6, 2022 Trial Tr. 238:12-17].

9.      On an annual basis, Victor Spivak, Grove's president, decided on an employee-by-employee basis whether to impose a cost of capital charge in the commission calculation based Mr. Spivak's desire to incentivize each employee.  [May 6, 2022 Trial Tr. 240:1-16]. In the years before 2015, Mr. Spivak did not impose a cost of capital deduction on Mr. Trindade's commission calculation because it would have eliminated any commissions.  [May 4,

2022 Trial Tr. 20:12-21:6].

The 401(k) Payments

10.     Beginning in 2014, Grove paid employer contributions into employee 401(k) accounts. [May 6, 2022 Trial Tr. 257:2-16]. Grove accounted for the 401(k) payments as part of year-end commission and bonus reporting. [May 6, 2022 Trial Tr. 256:11-257:9].

The 2016 Commission Plan

11.     Grove changed its commissions calculations for 2016 according to a new formula developed by Mr. Spivak and Mr. Gordon to better address Grove's goal of incentivizing its sales representatives. [May 4, 2022 Trial Tr. 34:8-23]. This new calculation eliminated deductions Grove previously applied to the Net Profits calculations, such as proportionate share of overhead, cost of interest and return on capital investment, and the $150,000 sales hurdle [May 4, 2022 Trial Tr. 40:17-41:10], but also reduced the commission percentage from 15 percent to 7.5 percent. [May 6, 2022 Trial Tr. 275:1-4]. Grove believed the 2016 formula would yield a higher payout to Grove salespeople. [May 4, 2022 Trial Tr. 37:17-23].

Grove Payment to Mr. Trindade of 2014 Commissions

12.     For 2014, Grove paid $7,041 into Mr. Trindade's 401(k) account [Apr. 27, 2022 Trial Tr. 37:15-25; Trial Exh. 10], which was paid in the first 40 days of 2015. [May 6, 2022 Trial Tr. 231:21-24]. Thereafter, Grove calculated that Mr. Trindade was owed $47,647.46 in commissions [Apr. 27, 2022 Trial Tr. 68:13-16] and Mr. Spivak approved $47,500 [*Id.* at 68:20-22] in discretionary bonus. [*Id.* at 68:23-25 Dkt No. 93 ¶ 4]. Grove did not reduce Mr. Trindade's commission for interest, return on capital investment or the performance hurdle. [May 6, 2022 Trial Tr. 252:22-253:7].

13.     After Grove calculated Mr. Trindade's performance commission and discretionary bonus, it instructed its payroll company to make a $88,106.46 lump sum payment of both the combined commission and discretionary bonus, net of the 401(k) contribution made on Mr. Trindade's behalf.  [Apr. 27, 2022 Trial Tr. 26:18-22; May 6, 2022 Trial Tr. 255:18-256:20; Trial Exh. 10].  Mr. Trindade did not object to his 2014 commission at the time it was paid in the spring of 2015.  [Dkt. No. 93 ¶ 4; Apr. 27, 2022 Trial Tr. 83:20-84:12].  With the exception of the 401(k) contribution, Mr. Trindade admitted that he didn't know whether he was owed any additional commission for 2014.  [Dkt. No. 93 ¶ 10].

Grove Estimated That Mr. Trindade Was Due No Commission for 2015

14.     Prior to 2014, Grove engaged in substantial business in Russian and Ukrainian markets.  [May 4, 2022 Trial Tr. 23:6-10].  This business was severely disrupted with the 2014 Russian invasion of Crimea, which destabilized the Ruble and prompted Russian countersanctions against American businesses, including Grove.  [May 4, 2022 Trial Tr. 23:6-24:8].  As Grove sustained substantial losses in Russia, Grove expanded business into Cuba, which presented the possibility of windfall gains or large losses as a "tender business."  [May 4, 2022 Trial Tr. 13:21-14:14].   Grove's decision to take tender business in Cuba for 2015 led to a "banner year" for Mr. Trindade.  [May 4, 2022 Trial Tr. 13:14-14:21].

15.     Despite its successes in Cuba, Grove's losses in Russian and Ukrainian markets led Mr. Spivak to decide that Grove could not forego the return on capital investment expense when calculating Mr. Trindade's commissions for 2015.  [May 4, 2022 Trial Tr. 21:16-22:5].  When the return on capital investment expense of $896,512.73 was included in the calculation, Mr. Gordon estimated that Mr. Trindade was due no commission for 2015.  [May 4, 2022 Trial

Tr. 25:8-13]. That was true even without applying the $150,000 performance hurdle for 2015 in that estimate. [May 4, 2022 Trial Tr. 22:17-20]. Accordingly, Grove paid Mr. Trindade no commission for 2015, but nevertheless paid him a $50,000 discretionary bonus [Apr. 27, 2022 Trial Tr. 56:4-16].

Grove Paid Mr. Trindade More Than The Commissions Due Him for 2016

16.     For 2016 Grove paid Mr. Trindade his $130,000 base salary and he earned $146,538 in performance commission under its new methodology. [Dkt. No. 93 ¶ 5; Trial Exh. 12; May 6, 2022 Trial Tr. 272:18-22]. From his commissions payment of $146,538, Grove allocated $6,759 to its payment into Mr. Trindade's 401(k) account for 2016. [Trial Exh. 12]. Mr. Trindade did not complain that this amount was deposited into his 401(k) at the time it was paid. [May 4, 2022 Trial Tr. 43:12-15]. Mr. Trindade did not object to his commission payment at the time. [Dkt. No. 93 ¶ 5]. Apart from the 401(k) contribution, Mr. Trindade admitted that he didn't know whether he was owed any additional commission for 2016. [Dkt. No. 93 ¶ 13].

Mr. Trindade Resigned from Grove and Commenced this Action

17.     Mr. Trindade terminated his employment with Grove effective December 31, 2017. [Trial Exh. 8 (Non-payment of wages complaint form – page 1)]. Mr. Trindade filed a Wage Act complaint with the Massachusetts Attorney General's office on March 6, 2019 for 2015 commissions payable in 2016. [Apr. 27, 2022 Trial Tr. at 34:12-16, Dkt. No. 1]. The Attorney General's office issued a right to sue letter on March 11, 2019. [Apr. 27, 2022 Trial Tr. at 34:17-19; Trial Exh. 8]. Mr. Trindade filed no separate complaint with the Attorney General's office for 2016 commissions payable in 2017. [May 2, 2022 Trial Tr. 118:10-14]. The Complaint seeking 2015 commissions was filed on April 15, 2019 and an Amended Complaint

8

seeking 2013, 2014 and 2016 commissions was filed on July 24, 2020. [Dkt No. 93 ¶¶ 6, 7].

## PROPOSED CONCLUSIONS OF LAW

A.   <u>Mr. Trindade Failed to Prove That Grove Materially Breached the Agreement</u>

To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Dickey v. Nat'l Football League*, No. 17-CV-12295-IT, 2018 WL 4623061, at *9 (D. Mass. Sept. 26, 2018), *aff'd*, No. 19-1097, 2020 WL 6819135 (1st Cir. Feb. 13, 2020) (granting motion to dismiss breach of contract claim). It rests with the plaintiff to explain what obligations were imposed on each of the parties by the alleged contract. *Barkhordar v. President & Fellows of Harvard Coll.*, 544 F. Supp. 3d 203, 210 (D. Mass. 2021) (granting motion to dismiss breach of contract claim). A material breach of an agreement occurs when there is a breach of an "essential and inducing feature" of the contract. *Dunkin' Donuts Inc. v. Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d 147, 155 (D. Mass. 2001) (franchisor did not materially breach contract with franchisee). Plaintiff must prove each of the elements, including damages, by a preponderance of the evidence. *Gemini Invs. Inc. v. AmeriPark, Inc.*, 643 F.3d 43, 48 (1st Cir. 2011) (affirming finding for defendant in breach of contract claim).

1.   <u>Mr. Trindade Failed to Prove That Grove Underpaid His 2014 Commissions</u>

In 2014, Mr. Trindade's gross profit was $1,376,340.74. [Trial Exh. 10]. Mr. Trindade's corporate overhead deduction, which was allocated based on the Gross Profit Method, was $741,494.00, leaving a Net Profit of $317,649.74. [Trial Exh. 10]. Mr. Spivak elected not to impose a cost of capital when calculating Mr. Trindade's 2014 commission because Mr. Spivak

wanted to pay Mr. Trindade a commission in keeping with Mr. Spivak's goal of incentivizing his sales representatives and rewarding them for their work. [May 4, 2022 Trial Tr. 20:18-21:6]. In addition, for 2014 Grove did not impose the $150,000 sales hurdle to reduce Mr. Trindade's Net Profit under the Agreement. [May 4, 2022 Trial Tr. 22:17-24]. Accordingly, Grove calculated Mr. Trindade was due $47,647.46 in commissions. [Dkt. No. 93 ¶ 4].

Mr. Trindade did not contest Grove's use of the Gross Profit Method to calculate overhead for 2014, which included the costs of all affiliates and at trial Mr. Trindade adopted the Gross Profit Method and Grove's in his own calculations for 2014 commissions. [Apr. 27, 2022 Trial Tr. 41:4-42:14].[2] Nevertheless, Mr. Trindade testified that Grove's deduction for 2014 overhead was inflated by $225,000 if his 8.33 percentage allocation under Gross Profit Method was applied to the "Adjusted 2014 Overhead" number of $6,204,105 as reflected in Trial Exhs. 5 at Grove 000059.012 and 11 [Apr. 27, 2022 Trial Tr. 40:17-42:7]. On cross examination, however, Mr. Trindade admitted he did not know Grove's actual 2014 corporate overhead. [Apr. 27, 2022 Trial Tr. 89:1-2]. By contrast, Mr. Gordon testified that he was the author of Trial Exhs. 5 and 11, which he prepared to help him estimate Mr. Trindade's commission for 2015, and the $6,204,105 Adjusted 2014 Overhead number was not Grove's overhead for 2014 for commission calculation purposes, which was $9.1 million. [May 6, 2022 Trial Tr. 269:7-16]. Mr. Gordon's testimony was not rebutted and Mr. Trindade did not demonstrate by a preponderance of the evidence that Grove underpaid his commission for 2014 based on the "Adjusted 2014 Overhead" number contained in Trial Exhs. 5 and 11.

---

[2] Notably, Grove used the same Gross Profit Method for estimating Mr. Trindade's 2015 commission entitlement. [May 6, 2022 Trial Tr. 266:13-267:1]. Mr. Trindade admitted that, if Grove used his expert's preferred Net Metric Tons Method for 2014, he was due no commissions for 2014. [May 2, 2022 Trial Tr. 12:24-14:15].

Indeed, Mr. Trindade admitted that he could not establish what he was owed under the Agreement for commissions in 2014 nor any amount he was owed for additional commission for 2014. [May 2, 2022 Trial Tr. 115:17-116:8; Dkt. No. 93 ¶ 10]. This is especially true since Mr. Trindade admitted that Grove could have but did not deduct from his commission for 2014 internal and external interest or a return on capital investment, which would have reduced commissions due to him in an amount he could not estimate. [May 2, 2022 Trial Tr. 15:21-18:6, 19:3-23, 28:24-29:16]. Mr. Trindade also admitted that Grove did not apply the $150,000 performance hurdle for 2014, which would have further reduced Mr. Trindade's commission entitlement to $25,147 if Grove had done so, which means Grove overpaid Mr. Trindade's commissions by $22,500. [May 2, 2022 Trial Tr. 32:9-17, 33:3-23].

Nevertheless, Mr. Trindade contended that Grove's accounting for a $7,041 payment into his 401(k) account from a 2014 lump sum payment of commissions and discretionary bonus violated his entitlement to commissions for 2014. [Apr. 27, 2022 Trial Tr. 37:20-38:15]. Mr. Gordon testified that Grove's 401(k) contribution to Mr. Trindade was considered by Grove to be a bonus and was accounted for out of his discretionary bonus. [May 6, 2022 Trial Tr. 256:21-257:11]. Mr. Trindade admitted that Grove could have reduced his discretionary bonus by the amount of the 401(k) contribution without breaching the contract. [Apr. 27, 2022 Trial Tr. 85:9-13].[3]

Moreover, Mr. Trindade was unable to credibly identify any damages associated with Grove's 401(k) contribution for 2014, even if it was drawn out of his commissions rather than

---

[3] Mr. Trindade's only "evidence" that Grove 401(k) payment reduced his commission rather than his discretionary bonus was that might have resigned if Grove had reduced his discretionary bonus rather than his commission. [Apr. 27, 2022 Trial Tr. 85:9-13]. This is not credible in the absence of an explanation why he didn't resign at the time if his 401(k) contribution was drawn against his commission rather than his bonus.

his bonus.  On cross examination, he refused to testify to the tax impact of his receipt of the payment into his retirement account, even if to estimate it.  [Apr. 27, 2022 Trial Tr. 69:19-70:3].  Mr. Trindade was unable to testify to whether he had withdrawn any of that 401(k) contribution or, if he did so, whether he paid any penalty on it. [Apr. 27, 2022 Trial Tr. 75:4-9].[4]  Accordingly, since Mr. Trindade failed to establish the minimum amount that was due to him for commissions in 2014 or that Grove's 401(k) contribution reduced the commissions he received below that minimum amount due to him and his 2014 breach of contract claim fails.  *Four Corners Serv. Station, Inc. v. Mobil Oil Corp.*, 51 F.3d 306, 312 (1st Cir. 1995) (compensatory damages not available where no demonstration of actual loss).

   2.  Mr. Trindade Failed To Establish Damages for 2016 Commission Payments

   For 2016, under its new commission calculation system, Grove owed Mr. Trindade commissions of $146,538, from which it reduced the final payment by $6,759 for a 401(k) contribution.  [Trial Exh. 12].  Mr. Trindade was unable to recover $315,900 lost when his Angolan customer failed to pay for product in 2015.  [Apr. 27, 2022 Trial Tr. 46:4-12].  As a result, the loss carried over from 2015 to 2016.  [Apr. 27, 2022 Trial Tr. 48:6-11].  That amount was deducted from his 2016 commission calculation, which Mr. Trindade does not dispute.  [Apr. 27, 2022 Trial Tr. 46:22-47:4].  [5]

   While Mr. Trindade identified numerous differences in the way Grove calculated his commission for 2016 as compared to the Agreement's terms [Apr. 27, 2022 Trial Tr. 43:22-

---

[4]     Mr. Trindade admitted that, even if he did prematurely withdraw the $7,401 deposited into his 401(k) account, the penalty would be 10 percent, or $740.01.  [May 2, 2022 Trial Tr. 8:1-10].

[5]     Although this loss was included in Mr. Gordon's estimation for 2015, it was not deducted from Mr. Trindade's commission calculation until 2016.  [May 6, 2022 Trial Tr. 268:24-269:1].  Mr. Gordon testified that the inclusion of the loss in his 2015 commission estimation didn't have an impact on whether Mr. Trindade would have been entitled to a commission for 2015.  [*Id.* at 268:9-23; 269:2-6]

44:14], he admitted that he could not establish the amount of commissions he was owed under the Agreement for 2016. [May 2, 2022 Trial Tr. 115:23-116:3; Dkt. No. 93 ¶ 13]. Mr. Gordon testified that he believed that this net commission paid to Mr. Trindade for 2016 was more that he would have received under the commission calculation in the Agreement. [May 6, 2022 Trial Tr. 273:22-274:25]. As Mr. Gordon pointed out, because the 2016 methodology eliminated the overhead deduction, which would have been larger in 2016 than in 2015, and Mr. Trindade would likely have been entitled to no commission at all under the Agreement's methodology. [May 6, 2022 Trial tr. 275:5-278:9].

Similar to his 2014 claim, Mr. Trindade was left asserting that Grove's deposit of $6,759 into his 401(k) account was the basis for his underpayment of 2016 commissions. [Apr. 27, 2022 Trial Tr. 45:2-21]. Given, however, that Mr. Trindade failed to establish the baseline of the commissions he was due under the Agreement for 2016, he failed to demonstrate that Grove underpaid his commission for that year. [Dkt. No. 93 ¶ 13; May 2, 2022 Trial Tr. 115:23-116: 3]. Moreover, even if the Court were to accept that Mr. Trindade was due the full amount of commission for 2016 under Grove's new methodology and that the 401(k) contribution impermissibly reduced that amount, Mr. Trindade failed to establish the financial harm of that 401(k) contribution to him rather than its payment as W2 wages.[6] That is not sufficient to establish contractual damages and the 2016 breach of contract claim fails. *Four Corners Serv. Station, Inc. v. Mobil Oil Corp.*, 51 F.3d at 312. Mr. Trindade Failed to Prove That He Was Owed Commissions for 2015

For 2015, given Grove's losses due to the cross sanctions over the Crimea invasion, Mr.

---

[6]     At most, however, assuming a 10% early withdrawal penalty, even if was not incurred, Mr. Trindade's maximum damages for 2016 would be $675.90.

Spivak asked Mr. Gordon to first estimate whether commissions would be due for any Grove employees before undertaking the effort to calculate the exact amounts. [May 6, 2022 Trial Tr. 258:7-25]. Mr. Gordon testified that Grove did not calculate the precise amount of Mr. Trindade's commission entitlement, but rather he undertook to estimate whether any commissions were due to Mr. Trindade for 2015 by extrapolating from Mr. Gordon's 2014 calculations. [May 6, 2022 Trial Tr. 258:16-259:24]. To that end, Mr. Gordon prepared a worksheet. [May 6, 2022 Trial Tr. 260:3-11; Trial Exhs. 5 at 00059.102 and 11]. Mr. Gordon testified that, for that worksheet, he used the 2014 overhead of $9.1 million, which was net of all the 2014 backed-out expenses and bad debt and determined that Grove's overhead for 2015 was likely 9.85 percent lower than in 2014. [May 6, 2022 Trial Tr. 264:4-265:14]. It is not disputed that, based on the Gross Profit Method, Mr. Trindade's share of gross profits was 34 percent, which Grove used to allocate overhead for 2015. [May 6, 2022 Trial Tr. 267:8-18]. That yielded an estimated overhead charge of $1,916,979.09 against Mr. Trindade's commission. [May 6, 2022 Trial Tr. 267:11-13; Trial Exh. 5 at Grove 000059.001]. Mr. Gordon concluded that Grove owed Mr. Trindade no commissions for 2015. [May 6, 2022 Trial Tr. 269:5-6]

Mr. Trindade did not dispute Grove's calculation of Mr. Trindade's gross sales, the actual cost of goods sold, or the costs of freight, storage and demurrage for Mr. Trindade's sales, which are elements (a) through (c) of the Agreement's commission calculation. [Trial Exhs. 3, ¶ 4(d)(ii) & 5; Apr. 27, 2022 Trial Tr. 54:17-55:22; May 6, 2022 Trial Tr. 169:2-170:4]. While Mr. Trindade testified that in April 2016 he asked Mr. Spivak to pay commissions for 2015, he could not remember how much he asked for. [May 2, 2022 Trial Tr. 108:15-17].

Nevertheless, at trial Mr. Trindade offered two alternative calculations by his expert, Mr.

14

Richards, that yielded commissions due to Mr. Trindade for 2015 using cost classifications and allocation methodologies different from what Grove used in 2014 and from what Mr. Gordon used for his 2015 estimate. [Trial Exh. 13 at 10, 12]. Mr. Richards opined that Mr. Trindade was owed either $287,839 using his own classification and allocation methodologies [Trial Exh. 13 at 10] or $123,250 using some of Grove's classification and allocation methodologies, but replacing the Gross Profit Method with the Net Metric Ton Method for allocation of overhead. [Trial Exh. 13 at 12; May 2, 2022 Trial Tr. 146:15-147:12].

Grove offered its own expert, Joel Wacek, to support the calculations undertaken by Mr. Gordon in estimating Mr. Trindade's commission entitlement for 2015 and to rebut Mr. Richards' analysis. [Trial Exh. 15]. Mr. Wacek opined that Mr. Trindade was not due commissions under either of the methods used by Mr. Richards when proper adjustments were made to Mr. Richards' calculations. [Trial Exh. 15 at 11-12].

The experts' dispute devolved into three classification and allocation issues: (i) whether Grove improperly included costs and revenues from wholly-owned affiliates in its estimate of Mr. Trindade's commissions; (ii) whether Grove unreasonably used the Gross Profit Method to allocate Mr. Trindade's proportionate share of its 2015 overhead; and (iii) whether Grove improperly calculated the return on invested capital deduction.

Was Grove's Classification of Costs and Revenues from Affiliates Unreasonable?

The Agreement defines the "Company" as "Grove Services, Inc., a Massachusetts company," [Trial Exh. 3 at 1], but does not address whether Grove Services, Inc. may include costs paid by Grove Services, Inc. for its controlled-entity affiliates or gross sales from such affiliates. [May 4, 2022 Trial Tr. 95:17-97:4]. In relevant part, the Agreement states that Mr.

15

Trindade's commission will be calculated based on, among other things, a "(e) proportionate amount of the overhead, costs and expenses of the Company's Atlanta office and a proportionate amount of the overhead, costs and expenses of the Company reasonably apportioned to the Company's Atlanta office," and "(f) a proportionate amount of all interest expenses (internal or external) calculated as a function of the working capital needs of the Company's Atlanta office," and "(g) a proportionate amount of a fifteen percent (15%) return on the capital investment of the Company in its Atlanta office." [Trial Exh. 3 ¶ 4(d)(ii)]. The parties agreed that a literal reading of the "proportionate share" language in the Agreement would impose on Mr. Trindade the entire overhead, costs and expenses of the Atlanta office, which was not fair or what they intended. [May 2, 2022 Trial Tr. 122:19-22; May 4, 2022 Trial Tr. 11:14-12:5].

Accordingly, the "proportionate" share "phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken," and is therefore ambiguous. *Den Norske Bank AS v. First Nat. Bank of Bos., N.A*., 838 F. Supp. 19, 26 (D. Mass. 1993) (denying summary judgment on breach of contract on ambiguous language). When a contract is ambiguous, courts can consult extrinsic evidence to determine the parties' intentions. *Id.* at 26. The presumption in commercial contracts is that the parties were trying to accomplish something rational. *Fishman v. LaSalle Nat. Bank*, 247 F.3d 300, 302 (1st Cir. 2001) (it is "centrally important" that a proffered interpretation "makes sense—that is, it carries out what one might imagine to be a plausible objective of parties so situated and is consistent with the usage of trade"). "Thus, a contract should be interpreted in a manner that avoids absurd results and give[s] it effect as a rational business

instrument." *Wipro Ltd. v. Analog Devices, Inc.*, 527 F. Supp. 3d 93, 98 (D. Mass. 2021) (granting motion for partial summary judgment). If one reading "carries out what one might imagine to be a plausible objective of parties" while another does not, the former is favored. *Fishman v. LaSalle Nat. Bank*, 247 F.3d at 302.

Here, when Mr. Trindade joined Grove in 2010, most of the sales operation was in Atlanta. [May 2, 2022 Trial Tr. 216:18-217:2]. Mr. Trindade sold product internationally and utilized Grove resources beyond the Atlanta office such as Grove affiliates in Switzerland and Brazil. [Apr. 27, 2022 Trial Tr. 20:9-21:14; May 2, 2022 Trial Tr. 140:20-141:3]. Grove interpreted "proportionate share" as Mr. Trindade's costs in proportion to all Grove company-wide costs because, as Mr. Spivak testified, the "Atlanta [office] wouldn't be able to function as a wholly-owned entity because of the missing roles that are not present in Atlanta" such as accounting and finance. [May 4, 2022 Trial Tr. 11:25-12:2; 19:18-20:11]. Mr. Trindade admitted that his "piece of the business" was represented by "Atlanta and whatever auxiliary services that were needed, accountants, any other kind of work necessary to execute this." [Apr. 27, 2022 Trial Tr. 71:17-21].

Between 2010 and 2014, Grove grew to have sales representatives in Boston, Atlanta, Hong Kong, Shenzhen, Latvia, Russia, and Georgia and the Atlanta office could not function as an independent entity. [May 2, 2022 Trial Tr. 217:3-10]. As a salesman, Mr. Trindade benefitted from the operations of Grove affiliates beyond Grove's Atlanta office and outside the United States. [May 2, 2022 Trial Tr. 141:1-3, 214:14-19; May 4, 2022 Trial Tr. 96:10-97:19].[7]

---

[7]     Mr. Gordon also testified that as part of Grove's annual calculation of overhead, Grove identified personal expenses, such as family cell phone bills, which were removed from the overhead calculation and separately charged to the employee. [May 6, 2022, Trial Tr. 250:3-19]. These expenses were not included in Grove's overhead

The experts included entities beyond Grove Services, Inc., in Mr. Trindade's commissions calculations. Neither Mr. Richards nor Mr. Wacek distinguished the Atlanta office for purposes of calculating overhead and both included Grove's Swiss affiliate in their calculations. [Trial Exh. 13 at 11, 13; May 2, 2022 Trial Tr. 148:22-150:10; 187:5-188:3; May 6, 2022 Trial Tr. 344:17-347:7]. Yet Mr. Richards offered no principled basis to include the Swiss affiliate, but exclude the other Grove affiliates that benefitted Mr. Trindade, especially given Grove included all affiliates' sales in Mr. Trindade's commission calculation for 2014 and 2016. [May 2, 2022 Trial Tr. 184:4-185:9; May 6, 2022 Trial Tr. 336:21-339:11].

Given ambiguity of "proportionate" in the commission calculations language and the post-contractual evolution of Grove's business that benefitted Mr. Trindade's business – and Mr. Trindade's acceptance of the benefits of Grove's classifications – Mr. Trindade did not demonstrate by a preponderance of the evidence that it was unreasonable for Grove to classify costs and revenues from all its affiliates' operations to be included in its calculations as his proportionate share for commission purposes. *Albertini v. Summit Tech. Servs., Inc.*, 287 F. Supp. 2d 92, 98 (D. Mass. 2003) (court seeks to "construe the contract with reference to the situation of the parties when they made it and the objects sought to be accomplished").

<u>Was Grove's Use of the Gross Profits Method To Allocate Overhead Unreasonable?</u>

Grove elected to use the Gross Profit Method to allocate overhead costs because it better addressed Grove's business objectives and suited the nature of the business as trading in non-uniform commodities. [May 4, 2022 Trial Tr. 10:15-21; May 6, 2022 Trial Tr. 252:4-9]. As

---

calculations, which passed auditor inspection. [May 6, 2022 Trial Tr. 250:3-251:2]. Likewise, FW Huntley, an IC-DISC owned by Mr. Spivak and used to facilitate exports of American products, and GS Real Estate Holdings, LLC was not included in overhead calculations. [May 6, 2022 Trial Tr. 251:5-23; 306:21-307:12].

explained by Mr. Spivak, Grove's "cost of goods sold fluctuates by the underlying commodity as [Grove] accumulated and replenished [its] supplies by logistics, costs, operations, documentations, credit risk, various other costs of goods sold that may be impacted as a result of the salesperson's region . . . ." [May 4, 2022 Trial Tr. 17:10-15]. The variations between regions in which Grove sold product resulted in an indirect relationship between the amount of product sold and the size of gross margins. [*Id.* at 17:15-23]. Mr. Spivak testified that he believed the Gross Profit Method was the fairest way to allocate overhead because the management controlled the cost inputs and, to the extent a salesperson benefitted achieved high profits from management's decisions, the overhead should be borne more heavily by that person. [May 2, 2022 Trial Tr. 219:6-220:4]. Mr. Spivak explained that this approach didn't penalize salespersons for poor profitability for reasons outside their control. [*Id.* at 220:18-221:19].

Mr. Spivak explained that the net metric tons measure could unfairly benefit some salespersons to the detriment of others because lower volume high profit sales would be burdened with less overhead than high volume low profit sales. [May 4, 2022 Trial Tr. 12:6-13:10]. As Mr. Spivak pointed out, use of net metric tons to allocate overhead does not address Grove's business objectives because Grove's costs of goods are were fixed. [*Id.* at 16:24-17:23]. Accordingly, Grove believed the Gross Profit Method was "the only reasonable and fair method to provide incentive to all the salespeople." [May 6, 2022 Trial Tr. 252:6-9].

Mr. Trindade testified it would be fair for Grove use a method to allocate overhead so long was the same methodology was used for everyone. [May 2, 2022 Trial Tr. 123:1-5]. Mr. Richards opined, however, that the Net Metric Ton Method was more accurate than the Gross Profit Method and thus it was not reasonable for Grove to use the Gross Profit Method

to allocate overhead.  [May 2, 2022 Trial Tr. 144:10-23].  On cross-examination, Mr. Richards admitted that his opinion did not consider Grove's business objectives in selecting the allocation method. [May 2, 2022 Trial Tr. 177:1-5].

`          In contrast, Mr. Wacek based his opinion on three of four criteria generally accepted in accounting for determining the appropriateness of allocation methods:  (i) benefits received, (ii) fairness and equity, and (iii) the ability to bear.  [May 6, 2022 Trial Tr. 354:2-356:1; Trial Exh. 15 at 8-9].  Mr. Wacek opined that the Gross Profit Method allocated overhead based on the benefits Mr. Trindade received from Grove's overhead, in an equitable way, in relation to what Mr. Trindade could bear.  [Trial Exh. 15 at 9; May 6, 2022 Trial Tr. 354:2-356:1].  Mr. Wacek concluded that the Gross Profit Method was therefore reasonable.  [May 6, 2022 Trial Tr. 353:14-19; 392:7-10].  Mr. Wacek's testimony was not rebutted by Mr. Richards nor was Mr. Wacek impeached on this point.  [May 6, 2022 Trial Tr. May 6, 2022 Trial Tr. 366:7-396:24]

          Accordingly, Mr. Trindade did not prove by a preponderance of the evidence that Grove's use of the Gross Profit Method allocate overhead for commission calculations was unreasonable.  *Atlantic Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541, 543 (1st Cir. 1993) (plaintiff bears burden to prove his interpretation by preponderance of the evidence).

Was Grove's Cost of Capital Classifications Reasonable?

          The Agreement provides that Mr. Trindade's Net Profits may be reduced by "(f) a proportionate amount of all interest expenses (internal or external) calculated as a function of the working capital needs of [Grove's] Atlanta office, and . . . (g) a proportionate amount of a fifteen percent (15%) return on the capital investment of the Company in its Atlanta office."  [Trial Exh.

3 ¶ 4(d)(ii)].  Mr. Trindade did not dispute that Grove had the right to deduct interest expense

and a return on its capital investment from his Net Profit for commission calculation.  [Apr. 27,

2022 Trial Tr. 31:21-22].  Mr. Trindade testified that the interest expense should be calculated as

6% of every transaction [May 2, 2022 Trial Tr. 113:2-11] and the capital investment was

determined by the amount immobilized in approximately $30,000 in fixed assets in the Atlanta

office, such as furniture.  [Apr. 27, 2022 Trial Tr. 52:10-15; 77:2-9; 79:16-80:6].  Mr. Trindade

admitted on cross-examination that the six percent interest rate exists nowhere in the Agreement.

[May 2, 2022 Trial Tr. 46:4-13].

    Grove calculated these two elements by applying a 15 percent return on the average

equity Grove used to support its business across all controlled affiliates.  [May 6, 2022 Trial Tr.

237:7-9].  Grove then allocated this return on capital investment using the Net Metric Tons

Method, which method is not in dispute for this aspect of the commission calculations.  [May 6,

2022 Trial Tr. 238:8-17].  Mr. Spivak explained that Grove used this classification approach

because it allocated the amount of capital investment required to finance Grove's commodities

trading business, the costs of paying deposits on future deliveries, buying product, financing the

product, carrying inventory, all of which requires capital.  [May 4, 2022 Trial Tr. 18:9-19:17].

Mr. Spivak rejected Mr. Trindade's assumption that the capital investment was limited to

$30,000 in assets in the Atlanta office.  *Id.*

    Nevertheless, relying on Mr. Trindade's definitions, Mr. Richards testified that the

interest and cost of capital deductions from Mr. Trindade's Net Profits should have been either

$34,380 using Mr. Trindade's assumptions described as Method 1 [Trial Exh. 13 at 10] or

$854,085 using Grove's assumptions described as Method 2 [Trial Exh. 13 at 12].  Under cross

examination, Mr. Richards agreed that Grove's capital investment was not limited to $30,000 in fixed assets in the Atlanta office.  [May 2, 2022 Trial Tr. 193:12-15].

Mr. Wacek opined that Mr. Richards' Method 1 was flawed because it contained only the cost of external interest, ignoring permitted costs for internal interest, and improperly relied on Mr. Trindade's $30,000 estimate of money immobilized in fixed assets, which ignores the contractual language of allowing for a return on capital investment.  [Trial Exh. 15 at 4-6; May 6, 2022 Trial Tr. 358:7-17].  In contrast, Mr. Wacek generally agreed with Mr. Richards' Method 2 for calculating interest and return on capital investment expenses, but disagreed that the interest expense and return on capital investment calculation should exclude Grove affiliates beyond the Swiss subsidiary.  [Trial Exh. 15 at 7-8].

In response to Mr. Richards expert report, Mr. Wacek introduced corrections to Mr. Richards' calculations of whether Mr. Trindade earned any commission for 2015 under the Agreement.  [Trial Exh. 15 Supp'l Exhs. C and D].  In unimpeached testimony, Mr. Wacek confirmed that, whether or not Grove affiliates were included in the commission calculations, Mr. Trindade was not entitled to any commission for 2015.  *Id.*  For his opinion, Mr. Wacek adopted Mr. Richards' Method 2 interest and return on capital investment calculations in coming to this conclusion.  *Id.* (Supp'l Exh. C Correction 1 column; Supp'l Exh. D Correction 1 column).[8]  Mr. Wacek explained, Grove's average committed capital was $39.7 million and Mr.

---

[8]    To calculate Grove's internal and external interest expense under Method 2, Mr. Richards used Grove's average net working capital from Grove's 2014-15 Balance Sheet By Month [Trial Exh. 6], applied a six percent interest rate, which he deemed as reasonable, and allocated 15.05 percent as Mr. Trindade's pro rata Gross Metric Tons share.  [Trial Exh. 13 at 5 & 14 (Schedule 2A)].  Mr. Wacek agreed that this was a reasonable method to determine the internal and external interest expense chargeable against Mr. Trindade's Net Profits and adopted it for his corrections to both Method 1 and Method 2.  [Trial Exh. 15 Supp'l Exhs. C and D].  Likewise, to calculate Grove's return on capital investment expense, under Method 2, Mr. Richards used Grove's 2014-15 Balance Sheet By Month [Trial Exh. 6] to determine the average total equity invested in the domestic business, applied a 15

Trindade's percentage using the Net Metric Tons Method amounted to 15.05 percent, which yielded $896,512.73 allocated against Mr. Trindade's estimated 2015 Net Profit.  [May 6, 2022 Trial Tr. 372:6-373:14].

Given there is no dispute that the Net Metric Tons Method was reasonable to allocate interest and capital investment expenses and the experts effectively agreed that Mr. Richards' Method 2 was reasonable, Mr. Trindade did not demonstrate by a preponderance of the evidence that Grove's classification of interest and cost of capital was unreasonable.  *Atlantic Track & Turnout Co. v. Perini Corp*., 989 F.2d at 543.

<u>Mr. Trindade Did Not Prove That Any Commissions Were Due To Him For 2015</u>

The "fundamental principle of damages that governs all contract cases is compensation, or the value that the plaintiff would have received had the contract been honored;" plaintiffs "are not entitled to be made more than whole or put in a better position than if the defendant had carried out his contract."  *Haven Real Est. Grp., LLC v. Bell Atl. Mobile of Massachusetts Corp., Ltd*., 236 F. Supp. 3d 454, 463 (D. Mass. 2017) (summary judgment for defendant on breach of contract where plaintiff could not prove damages).  For 2015, Mr. Trindade offered calculations from his expert, Mr. Richards, to seek to establish the commission payable to Mr. Trindade for 2015.  [Trial Exh. 13].  Mr. Richards used two methods to calculate Mr. Trindade's entitlement to 2015 commissions.  Under Method 1, Mr. Richards concluded that Mr. Trindade was owed $287,839 in commissions, using the Net Metric Tons Method to allocate overhead.  [Trial Exh.

---

percent rate of return as set forth in the Agreement, and allocated 15.05 percent as Mr. Trindade's pro rata Gross Metric Tons share.  [Trial Exh. 13 at 5 & 15 (Schedule 3A)].  Mr. Wacek agreed with Mr. Richards methodology and calculations for the return on capital investment expense set forth in Method 2, but opined that it was understated in its failure to include Grove's wholly-owned affiliates, which would have yielded a larger deduction against Mr. Trindade's Net Profits.  [Trial Exh. 15 at 6-7 and Supp'l Exhs. C and D].

13 at 10].  Alternatively, under Method 2 Mr. Richards calculated Mr. Trindade was owed
$123,250 commissions,  also using the Net Metric Tons Method. [Trial Exh. 13 at 12].[9]

 First, unless the Court finds that Mr. Trindade proved by a preponderance of the evidence
that Grove's allocation of overhead by the Gross Profit Method was unreasonable, Mr. Richards'
opinions are not probative.  Indeed, he admitted that he did not render an opinion using the Gross
Profit Method.  [May 2, 2022 Trial Tr. 193:16-194:5].  Mr. Wacek provided the Court with
Gross Profit Method calculations as corrections to Mr. Richards' expert report and opined that,
even with Mr. Richards' other adjustments, Grove would have owed Mr. Trindade nothing in
commissions  for 2015 if the Court accepts Grove's use of the Gross Profit Method as reasonable.
[Trial Exh. 15 at 11-12].

 Second, without confirming their accuracy, Mr. Richards relied on expense tables
prepared by Mr. Trindade.  [May 2, 2022 Trial Tr. 119:19-120:6; 178:18-179:4].[10]  By failing to
undertake his own analysis of what sales expenses should have been included or excluded from
Grove's overhead for 2015, Mr. Richards impermissibly  deferred to Mr. Trindade in Mr.
Richard's damages estimates.  *United States v. Organon USA Inc*., No. CV 07-12153-RWZ,
2015 WL 10002943 *3 (D. Mass. Aug. 17, 2015) (excluding expert testimony offered without
being sufficiently grounded in evidence).

 Finally, Mr. Wacek opined that for Mr. Trindade to have been due any commission for
2015 using the Gross Profit Method for allocating overhead, Grove's overhead could have been

---

[9] While  Mr. Richards claimed at trial that his Method 1 reflected his opinion and he included Method 2 for
comparison purposes only [May 2, 2022 Trial Tr. 177:14-178:13], that does not appear anywhere in Mr. Richards
report and he may not modify his opinion at trial.  *Rivera-Marrero v. Presbyterian Cmty. Hosp*., 255 F. Supp. 3d
290, 295-97 (D.P.R. 2017) (barring expert testimony on medical consent where that theory had not been included in
expert's report before trial).  Nor did Mr. Richards testify that his Method 2 was unreasonable.
[10] Mr. Spivak testified that personal expenses reflected on the expense tables are reversed out and personally
charged to Grove personnel.  [May 4, 2022 Trial Tr. 15:14-16:11].

no more than $3,874,182, which opinion was not impeached.  [Trial Exh. 15 at 12 & Supp'l Exh. D (Overhead Threshold column)].  Nothing in the record establishes that Grove's overhead was below that number and Mr. Trindade failed prove that he was entitled to commissions for 2015.

B.  The Wage Act Claims Are Also Time-Barred

An individual alleging non-payment or untimely payment of wages under the Wage Act must file his complaint within three years of the violation, with time tolled from the date that he or a similarly situated employee files a complaint with the attorney general alleging the violation. Mass. Gen. Laws Ann. ch. 149, § 150.  The Agreement indicated that commission must be paid within sixty days of the end of the year for which it is calculated.  [Trial Exh. 3 ¶ 4(d)(i); Apr. 27, 2022 Trial Tr. 66:7-10].  Accordingly, any commission payment due Mr. Trindade for 2015 commission was due on or before February 29, 2016 and commission payment due him for 2016 was due on or before March 1, 2017.  [Trial Exh. 3 ¶ 4(d)(i)].

Mr. Gordon testified that, for most years, he would collect the information necessary to make the commission calculations for Grove in mid-February and then seek to meet with Grove's executives near the end of February to discuss commission and bonus awards.  [May 6, 2022 Trial Tr. 232:25-233:4, 239:11-17].  There is no dispute that Grove paid Mr. Trindade no commissions in 2015 and paid them late in 2016.  [Apr. 27, 2022 Trial Tr. 66:13-18].  Mr. Trindade admitted that he knew that Grove failed to pay him for 2015 commissions by the deadlines, but he did not complain out of fear that he would jeopardize his discretionary bonus. [Apr. 27, 2022 Trial Tr. 27:7-16; 66:16-22].

The last day by which Mr. Trindade could have filed a timely Wage Act claim for his 2015 commission was March 6, 2019, accounting for the five days between his filing of a

25

complaint with the Attorney General and his receipt of a right to sue letter.  [Trial Exh. 8].
However, Mr. Trindade did not file a complaint until April 15, 2019, more than a month after the
statute of limitations had passed.  [Dkt. No. 1; Dkt. No. 93 ¶ 6].  As Mr. Trindade's 2015 claim
was not filed until after the statute of limitations had expired, it cannot succeed.  Mass. Gen.
Laws Ann. ch. 149, § 150.

To be timely, Mr. Trindade's complaint alleging Wage Act violations for 2016
commission entitlements must have been filed no later than March 2, 2020.  Mass. Gen. Laws
Ann. ch. 149, § 150.  Mr. Trindade admitted that he knew the final payment of his 2016
commissions was more than 60 days after the end of the year. [Apr. 22, 2022 Trial Tr. 44:21-23;
67:15-18; May 2, 2022 Trial Tr. 134:12-19].  Nevertheless, Mr. Trindade's original April 15,
2019 complaint alleged only Wage Act violations for his 2015 commission.  [Dkt. No. 1].  He
first brought allegations of violations for the 2016 employment year in his amended complaint,
which was filed on July 24, 2020.  [Dkt. No. 42].  Mr. Trindade's 2016 Wage Act claim is barred
by the Statute of Limitations.  Mass. Gen. Laws Ann. ch. 149, § 150.

While the rules of "relation back" are liberal where a party seeks to amend a complaint
after a statute of limitations has expired, the rules "are not so broad as to encompass any claim
that was known to the complainant that could have been brought in a timely fashion."  *Weber v.
Cmty. Teamwork, Inc*., 434 Mass. 761, 785–86 (2001) (finding untimely claim did not relate
back and was therefore time-barred).  Under Rule 15 of the Federal Rules of Civil Procedure, an
amended pleading only relates back when the law provides an applicable statute or when the
amendment asserts a claim or defense that "arose out of the conduct, transaction, or occurrence
set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1).

By the time he filed his original complaint on April 15, 2019, Mr. Trindade was aware of the facts that would give rise to his amended complaint and 2016 Wage Act claim, including the fact that Grove used a different formula to calculate commissions in 2016.  [Apr. 27, 2022 Trial Tr. 43:11-44:8; May 2, 2022 Trial Tr. 118:1-14].  He nevertheless elected not to include a 2016 Wage Act claim in his original complaint [Dkt. No. 1] and offered no explanation for the failure to do so.  As Mr. Trindade's 2016 Wage Act claim was not alleged until after the limitations deadline had passed and does not relate back to his original complaint, it is time-barred.  Mass. Gen. Laws Ann. ch. 149, § 150; *Weber v. Cmty. Teamwork, Inc*., 434 Mass. at 786.[11]

## CONCLUSION

For the foregoing reasons, Grove and Mr. Spivak respectfully request that the Court rule in their favor on all counts of the Amended Complaint.

Dated: October 18, 2022                           Respectfully submitted,

Grove Services, Inc. and Victor Spivak
By their attorneys,

/s/ Irwin B. Schwartz
Irwin B. Schwartz (BBO# 548763)
ischwartz@blaschwartz.com
BLA Schwartz, PC
One University Ave., Suite 302B
Westwood, Massachusetts 02090
Phone:  781-636-5000
Fax:      781-636-5090

## Certificate of Service

I, Irwin B. Schwartz, as attorney for defendants Grove Services,  Inc. and Victor Spivak,

---

[11]        Mr. Trindade also admitted that he failed to file a complaint with the Massachusetts Attorney General's office for his 2016 Wage Act claim.  [May 2, 2022 Trial Tr. 118:10-14].  On that basis as well, Mr. Trindade's 2016 Wage Act claim must be denied.  Mass. Gen. Laws Ann. ch. 149, § 150.

hereby certify that on this 18th day of October 2022, I filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Irwin B. Schwartz
Irwin B. Schwartz

28