UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAULO TRINDADE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 19-cv-10717-ADB |
| GROVE SERVICES, INC. and VICTOR SPIVAK | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

Table of Contents

I.    INTRODUCTION ................................................................................................ 2

II.   PROCEDURAL HISTORY ................................................................................ 2

III.  FINDINGS OF FACT ......................................................................................... 3

    A.   The Parties .................................................................................................... 3

    B.   The Employment Agreement ........................................................................ 3

    C.   Plaintiff's Commissions ............................................................................... 5

    D.   Plaintiff's AGO Complaint and Lawsuit ................................................... 12

IV.   CONCLUSIONS OF LAW ............................................................................... 12

    A.   Count I: Wage Act Violations ..................................................................... 13

    i.    Threshold Issues .......................................................................................... 14

    ii.   2016 Wage Act Claim ................................................................................. 16

    iii.  2015 Wage Act Claim ................................................................................. 18

    B.   Count II: Breach of Contract ....................................................................... 21

V.    DAMAGES ......................................................................................................... 22

VI.   CONCLUSION .................................................................................................. 23

BURROUGHS, D.J.

## I.      INTRODUCTION

Paulo Trindade ("Plaintiff") brought this action against his former employer Grove Services, Inc. ("Grove") and its President, Victor Spivak ("Spivak," together "Defendants"), alleging breach of contract and violations of the Massachusetts Wage Act ("Wage Act"), Mass. Gen. Laws ch. 149, §§ 148–50, in connection with commissions allegedly due to him under his employment contract from 2013 to 2016.

## II.     PROCEDURAL HISTORY

Plaintiff first filed suit against Defendants on April 15, 2019.  [ECF No. 1].  On July 24, 2020, he filed an amended complaint asserting violations of the Wage Act for failure to pay timely pay due and payable wages (Count I), [ECF No. 42 ("Am. Compl.")] ¶¶ 17–26], and breach of contract (Count II), [id. ¶¶ 27–31], against both Defendants.  Defendants moved to dismiss the amended complaint on August 7, 2020.  [ECF No. 46].  On November 9, 2020, the Court granted the motion only as to Count II as alleged against Spivak.  [ECF No. 89].  Shortly thereafter, on December 9, 2020, Defendants moved for partial summary judgment on the claims arising from Plaintiff's 2013, 2014, and 2016 commission payments.  [ECF No. 91].  The motion was denied on September 16, 2021.  [ECF No. 101].

The case proceeded to trial on Count I against both Defendants and Count II against Grove.  A five-day bench trial took place between April 27 and May 13, 2022.  [ECF Nos. 193, 196, 198–99, 201].  The Court heard testimony from five witnesses.  [Id.].  After closings, the parties submitted proposed findings of fact and conclusions of law.  [ECF Nos. 222–23].  During trial, the parties each moved for judgment on the findings.  [ECF No. 194 (Defendants)]; [ECF No. 200 (Plaintiff)].  Both motions were opposed, see [ECF Nos. 197, 202], and are still pending before the Court.

Having considered the evidence presented at trial, the parties' motions for judgment on the partial findings, and the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## III.      FINDINGS OF FACT

### A.      The Parties

Grove is an export trading company that sells frozen meat products, primarily outside the United States.  [April 27 Tr. 19:20–20:8.  The company is headquartered in Massachusetts and has offices in Atlanta, Brazil, Switzerland, Hong Kong, and Russia as well as a distribution operation in Ukraine.  [Id. at 21:13–22:3].  Spivak is the company's owner and President, and also the primary salesperson for Russia and Ukraine.  [Id. at 22:12–17].  From 2010 to 2017, Plaintiff worked for Grove as the Product and Sales Director for Latin America.  [Ex. 3 ¶ A.1.(a); April 27 Tr. 19:18–19, 20:13–14].  He was based in the company's Atlanta office.  [April 27 Tr. 21:13–14].

### B.      The Employment Agreement

Plaintiff entered into an employment agreement (the "Agreement") with Grove on September 24, 2010, [Ex. 3], which was drafted by Grove, [April 27 Tr. 24:18–19].

Plaintiff's primary responsibility was to sell products in Latin America.  [April 27 Tr. 20:22–21:12].  Pursuant to the Agreement, he was to receive an annual base salary of $130,000 and a "gross commission on sales generated and managed by [Plaintiff] . . . equal to fifteen percent (15%) of the Net Profits attributable to such sales to the extent that such Net Profits exceed []$150,000 in the aggregate in any calendar year."  [Ex. 3 ¶ A.4(a), (d)(i)].  The commission would be equal to: "the gross sales order amount generated and managed by [Plaintiff]" minus the following six categories of deductions.  [Id. 3 ¶ 4(d)(ii)].

> [1] [T]he actual costs of goods sold attributable to such sales orders . . . [2] all transportation and freight charges relating to the transportation of product and all storage charges, demurrage charges, insurance and other costs and expenses directly relating to such sales orders . . . [3] a proportionate amount of the salary, bonus, benefits and other compensation paid to or on behalf of employees and consultants, including you, working out of or for the Company's Atlanta office . . . [4] proportionate amount of the overhead, costs and expenses of the Company's Atlanta office and a proportionate amount of the overhead, costs and expenses of the Company reasonably apportioned to the Company's Atlanta office . . . [5] a proportionate amount of all interest expenses (internal or external) calculated as a function of the working capital needs of the Company's Atlanta office . . . [6] a proportionate amount of a fifteen percent (15%) return on the capital investment of the Company in its Atlanta office.

[Id. ¶ 4(d)(ii)].

The Agreement provided that, "[a]ll classifications of costs shall be made by the Company and all calculations of proportionate amounts of such costs shall be made by the Company in accordance with any reasonable allocation method selected by the Company." [Id.] "Company" is defined by the Agreement as "Grove Services, Inc., a Massachusetts corporation." [Id. at 2]. The Agreement required that the commission "shall be calculated by the Company and paid to you within sixty (60) days after the relevant calendar year end." [Id. ¶ 4(d)(i)].

In addition to base pay and commission, following his first full year of employment, Plaintiff was eligible for a Retention Incentive Program, which was a discretionary bonus that "[t]he Company may, in its sole discretion, elect to establish . . . . on terms and conditions" that would be determined also by Grove. [Id. ¶ 4(e)]. Grove had "no obligation" to establish a Retention Incentive Program. [Id.]. The "nature and timing" of other bonuses, if any, was "determined by [Spivak] in his sole discretion." [Id. ¶ 4(f)].

Finally, per the terms of the Agreement, "[n]o amendment or alternation of the terms of this letter agreement shall be valid unless made in a writing signed by each of the parties hereto and specifically referencing this letter agreement." [Id. ¶ 15]. The Agreement was never

amended in writing and remained in effect for the entirety of Plaintiff's employment with Grove. [May 4 Tr. 83:2–8].

### C.   Plaintiff's Commissions

At the heart of this dispute is Plaintiff's commission compensation for the years 2014–2016.[1]

i.   <u>Plaintiff's Commissions</u>

Grove typically provided Plaintiff with a one-page breakdown, called a "Bonus Summary," that showed his commission calculation prior to his commission being paid each year.  [April 27 Tr. 27:17–28:21; <u>see also</u> [Ex. 9 (2013 Bonus Summary), Ex. 10 (2014 Bonus Summary), Ex. 12 (2016 Bonus Summary)].  Grove typically did not calculate commissions until it received bills, payments, and other financial information for the previous year, which was usually by mid-February.  [May 6 Tr. 232:25–233:10].  Grove's accountant, Jason Gordon ("Gordon"), testified that it would take approximately two additional weeks to calculate the sales commissions.  [<u>Id.</u> at 233:3–4].  This meant that, in practice, Plaintiff's commission was typically not paid within 60 days after the end of the previous calendar year as required by the Agreement.  Plaintiff testified that his commissions were typically not paid until the spring. [April 27 Tr. 26:20–27:6].

Gordon calculated the commissions for all sales representatives and Spivak reviewed those calculations and sometimes made changes.  [May 6 Tr. 279:21–282:4, 283:12–15].  For example, each year, Spivak decided on an employee-by-employee basis whether to impose return on capital investment and interest expenses, known as the "cost of capital" charge, in the

---

[1] Plaintiff waived any claims regarding his 2013 commissions at the outset of trial.  <u>See</u> [ECF No. 197 at 2].

commission calculation, even though the imposition of this cost was required, and therefore not technically discretionary, under the Agreement.  [Id. at 240:1–16, 281:25–282:4].  Spivak testified that he sometimes chose to forego the cost of capital charge in calculating commissions for salespeople, including Plaintiff, when applying the cost would eliminate any commissions. [May 4 Tr. 20:22–21:10].

      ii.    2014

For 2014, Plaintiff was paid $47,647.46 in sales commissions and a discretionary bonus of $47,500.00.  [Apr. 27 Tr. 68:13–22].  Plaintiff testified that he was underpaid sales commissions in 2014 by $7,041.00, which he alleged Defendants improperly diverted from his commissions and instead paid into his 401(k) account without his consent and in violation of the Agreement.  [ECF No. 223 at 6; Ex. 10; April 27 Tr. 38:1–15].  Gordon testified that this 401(k) contribution was deducted from the discretionary management bonus, not the sales commission. [May 6 Tr. 256:16–257:20]; see also [id. at 231:13–24].[2]

      iii.    2015

Grove did not pay Plaintiff any sales commission for 2015.  The parties agree that 2015 was an atypical year for Grove.  The company expanded into Cuba for the first time, resulting in a "banner year" for Plaintiff's individual sales, but its substantial business in Russia and Ukraine, led primarily by Spivak, was significantly disrupted by instability in the region and countersanctions against U.S. businesses, causing overall losses for the company.  See [ECF No. 223 at 7–9; May 4 Tr. 13:14–14:2, 23:3–18].

---

[2] Although Plaintiff also asserted at trial that Grove attributed an excessive amount of overhead expenses to him to manipulate the amount of his 2014 commissions, [ECF No. 33 at 6; April 27 Tr. 41:1–24], he has not requested damages for this alleged breach in post-trial submissions or his motion for judgment on partial findings, see [ECF No. 200].

As a result of those losses, Spivak decided that Grove could not forego the return on capital investment expense when calculating Plaintiff's commissions for 2015 even though it had done so in the past. [May 4 Tr. 21:16–22:5]. When the return on capital investment expense of $896,512.73 was included in Plaintiff's 2015 commission calculation, Gordon estimated that Plaintiff was due no commission for 2015, [May 4 Tr. 25:8–13; May 6 Tr. 267:25–268:8]; see also [Ex. 2 (2015 Bonus Summary)], even though, for Plaintiff personally, it was his most profitable sales year, [ECF No. 223 at 8]. While he received no sales commission, Plaintiff was still paid a $50,000 discretionary bonus. [Apr. 27 Tr. 56:10–16].

Spivak told Plaintiff that he would not receive any sales commissions for 2015 first by email and then on the phone on April 19, 2016. [May 2 Tr. 130:10–131:8; Ex. 40 (Spivak email to Plaintiff)]. At that time, Plaintiff did not have the documentation he needed to calculate what he had earned in commissions, but, based on his sales in Cuba, he did not anticipate receiving zero. [Ex. 40; May 4 Tr. 66:19–67:2; April 27 Tr. 56:4–16]. For that year, Grove did not provide Plaintiff with any version of a "Bonus Summary" until after this lawsuit was filed. [April 27 Tr. 47:13–15, 56:7–9].

At trial, Plaintiff challenged the cost of capital and the overhead allocated to him by Grove for 2015 which were $896,512.73 and $1,916,979.09, respectively. See [Exs. 2, 5]. Plaintiff asserted that neither number was limited to Grove's Atlanta office as dictated by the Agreement, and that Defendants had attributed numerous additional improper charges to Plaintiff's overhead. See [April 27 Tr. 58:1–64:1; Ex. 7 (Grove's 2015 Detailed Overhead Transactions)]. Defendants did not dispute that, in 2015 and the other years Plaintiff was employed by Grove, the calculations for both cost of capital and overhead generally reflected expenses for all entities that formed the trading company rather than being limited to Atlanta,.

See [May 4 Tr. 81:4–24, 55:18–63:6; May 6 Tr. 248:3–249:4, 287:1–96:1]; see also [Ex. 5 at Grove000059-010] (Grove's 2015 Expense Total); Ex. 11 (Grove 2015 Overhead Analysis)]. Spivak testified that he interpreted the Agreement to include all entities that fall "[u]nder the Grove-controlled umbrella[,]" [May 6 Tr. 61:2–7]; that he "considered all entities part of Grove Services, Inc. and affiliates, because all entities were developed and registered for the purposes of serving Grove Services, Inc.," [id. at 79:19–22]; and that any reference to the Atlanta office was just an indication of where the employee was situated, [id. 80:8–20].  Gordon further explained that only considering the Atlanta office for the purpose of calculating working capital and overhead deductions for each salesperson would not be accurate in practice because the entities were "really one business."  [May 6 Tr. 293:5–9].  As an example, "[a] lot of people in Atlanta used the Swiss entity to . . . purchase and sell product. . . . The people sitting in the Atlanta office needed to use the working capital of Switzerland to conduct their business."  [Id. at 293:8–14].  Moreover, according to Gordon, whether he calculated Plaintiff's proportionate share of cost of capital by (1) identifying costs across the company used by Plaintiff directly, or (2) first attributing those costs to the Atlanta office and then to Plaintiff, the number reached at the end would be the same.  [Id. at 293:21–294:8].[3]

---

[3] At trial, Plaintiff also asserted that interest expense should be calculated at 6 percent, and that the capital investment in the Atlanta office was only $30,000 in fixed assets, [May 2 Tr. 112:14–114:17, 159:12–23; Apr. 27 Tr. 52:10–15, 76:14–18, 79:24–80:3], but did not provide a source or explanation for these numbers beyond his own speculation.  Even his expert agreed that the only source for the 6 percent number was Plaintiff's deposition and that Grove's capital investment was not limited to $30,000 in fixed assets in the Atlanta office.  [May 2 Tr. 190:8–191:3, 193:12–15].  Grove, on the other hand, explained that it calculated both elements by applying a 15 percent return on the average equity Grove used to support its business across all controlled affiliates and then allocated this return on capital investment by proportionate shares based on net metric tons sold by each salesperson.  [May 6 Tr. 237:7–9].

Plaintiff also challenged Grove's method for calculating the company's overhead costs that year and then allocating those overhead costs to salespeople. Anticipating potential reductions in commissions as a result of Grove's "bad year" and knowing that overhead costs would remain mostly the same from the year prior, Grove used its 2014 total overhead to estimate its total overhead for 2015. [May 6 Tr. 258:3–260:11]. To calculate commissions for 2015, Gordon explained that he took the company's "raw" overhead calculation of $5,773,966, "backed out" certain variables to "equalize" the years, and came up with a 9.85 percent reduction in overhead from 2014 to 2015. [May 6 Tr. 262:16–264:10]. Applying that reduction along with further reductions for bad debts incurred in 2014, Gordon then determined that the corporate overhead for 2015 would be at least $5,593,194.00. [Id. at 265:3–14]. To determine an individual salesperson's share of the overhead, he used their contribution to Grove's overall gross profit, as he had done in previous years. [Id. at 266:3–7]. It is undisputed that Plaintiff's share of gross profits was 34%, which for 2015, yielded an overhead charge of $1,916,979.09 against Plaintiff's commission. [May 6 Tr. 267:11–13; 393: 11–19]; see also [Ex. 2, 5; April 27 Tr. 7:1–2].[4]

At trial, Plaintiff's expert David Richards and Defendants' expert Joel Wacek offered competing testimony regarding the reasonableness of these calculation methods for 2015. See [Exs. 13–15]. Richards, on behalf of Plaintiff, opined that the "gross profit method" used by Defendants was not a reasonable method for calculating overhead allocations for commissions. [Ex. 13 at 7–8]. The "gross profit method" allocated corporate overhead to Plaintiff based on his

---

[4] Plaintiff also asserted that Grove improperly deducted a loss from a bad sale from his 2015 sales commission because Grove also deducted that same debt from his 2016 sales commission, but he did not request damages resulting from this double counting in his post-trial submission. See [ECF No. 223 at 9–10].

proportion of Grove's gross profit.  [Ex. 15 at 11].  Richards favored a calculation based on net metric tons sold—which uses relative sales volumes as the allocation basis rather than proportional gross profit—claiming the gross profit method risks disproportionately allocating overheard regardless of use of common resources.  [Ex. 13 at 7–8]; see also [Ex. 15 at 11].  He proposed two alternative calculations for Plaintiff's 2015 commissions.  The first applied his own estimation of appropriate overhead and cost of capital charges, based on documents provided by Plaintiff, and then applied the net metric ton formula to calculate a total commissions payout of $287,839.00.  [Ex. 13 at 7–8, 13].  The second assumed all charges as allocated by Grove, but applied the net metric ton formula to calculate overhead to Plaintiff and then a total commissions payout of $123,250.00.  [Id. at 7–8, 15]; see also [May 2 Tr. 146:15– 147:12, 161:19–24].

Defendants' expert, Wacek, in turn, testified regarding the reasonableness of the gross profit method to calculate overhead for Grove's business and attacked Richards' cost allocation methodologies.  [Exs. 14–15].  He opined that though he agreed with Richards that a "non-financial metric" such as sales volumes provides a reasonable basis for overhead allocations, it is not "the *only* reasonable method" for allocation, and that "allocation of corporate overhead expenses using proportional gross profit is [also] a reasonable allocation approach given the nature of Grove's business, the types of corporate overhead expenses being allocated, and the business purpose for the allocations."  [Ex. 15 at 13]; see also [id.] (Wacek's report explained that "gross profit, as opposed to other commonly used allocation bases such as sales revenue, volume, or headcount, better reflects the nature of Grove's business and the fact that profits are not generated based solely on sales amounts alone, but rather on Grove's expertise in evaluating markets and the potential for profitability of those sales.").  Spivak and Gordon also provided

testimony explaining why they believed using gross profit to allocate each salesperson's proportion of overhead costs was superior to using net metric tons.  See [May 4 Tr. 9:15–21; May 6 Tr. 238:18–239:6; 252:4–9; 282:5–13].

Moreover, Wacek opined that Plaintiff was due no commission even under either of Richards' two calculation models when the proper adjustments were made, [Ex. 14 at 9], and ultimately concluded that whether or not Grove affiliates were included in the commission calculations, Plaintiff was not entitled to any commission for 2015 as he "accounted for a greater percentage of Grove's overall business in 2015 than in prior years[]" and therefore a greater proportionate share of allocable overhead than in prior years, [Ex. 14 at 7].

          ii.    2016

Grove changed its commissions calculations for 2016 and moved to a new formula developed by Spivak and Gordon that they believed would better incentivize salespeople, be simpler to calculate, and be a "more fair, reasonable" assessment of commissions.  [May 4 Tr. 34:8–23; May 6 Tr. 272:5–11].  This new calculation eliminated all the deductions Grove had previously applied to the net profit calculations, including proportionate share of overhead, cost of interest, return on capital investment, and the $150,000 sales hurdle, [id. at 40:17–41:11], but also reduced the commission percentage from 15 percent to 7.5 percent, [id. at 275:1–4].  Grove believed the 2016 formula would yield a higher payout to salespeople.  [Id. at 37:17–23].

Pursuant to this new formula, for 2016 Grove paid Plaintiff his $130,000 base salary and a $101,093.00 total performance commission.  [Ex. 12].  As in 2014, Grove made a $6,759.00 contribution to Plaintiff's 401(k) account, which Gordon testified was deducted from Plaintiff's commission payment for 2016 under the new commissions "regime."  [May 6 Tr. 333:12–20; Ex. 12].  Plaintiff was not paid a discretionary bonus for 2016.  [May 2 Tr. 126:20–22; Ex. 12].

Additionally, as in previous years, the $101,093.00 commissions payment was not paid to Plaintiff on or before the deadline set forth in the Agreement.  [April 27 Tr. 44:18–23; May 6 Tr. 331:11–19, 334:21–35:3].

### D.    Plaintiff's AGO Complaint and Lawsuit

Plaintiff terminated his employment with Grove effective December 31, 2017.  [Ex. 8 at 2].  He filed a non-payment of wages complaint with the Massachusetts Attorney General's Office ("AGO") on March 6, 2019, concerning his unpaid sales commissions.  [Id. at 4].  The complaint stated that he was owed "[u]npaid commissions" and that he worked from Grove from 2010 to 2017, but did not specify any particular year for which he was seeking unpaid commissions.  [Id. at 2–4].  He received a Private Right of Action letter from the AGO on March 11, 2019.  [Id. at 1].

## IV.    CONCLUSIONS OF LAW

Plaintiff contends that for each year from 2014 to 2016, Defendants failed to compensate him in accordance with the Agreement in some way or another and that he is entitled to contract damages in the amount of $441,418 for all three years including $287,839.00 for 2015, $146,538.00 for 2016, and $7,041.00 for 2014.  [ECF No. 223 at 29].  If Defendants are found liable under both Wage Act counts, Plaintiff asserts that he is entitled to $763,170.00 in trebled damages for unpaid 2016 commissions and $863,517.00 in trebled damages for unpaid 2015 commissions.  [Id. at 23, 26–27].

Defendants respond that (1) the Wage Act claims are time-barred and that Plaintiff has (2) failed to prove that Grove underpaid his 2014 commissions, (3) failed to establish damages

for the 2016 commission payments, and (4) failed to prove that any commissions were due to him for 2015.[5]  See generally [ECF No. 222].

For the reasons set forth below, the Court finds that Defendants are liable for breach of contract and Wage Act violations for unpaid commissions for calendar years 2014 and 2016 and that Plaintiff is entitled to $330,597.00 in resulting damages.

### A.    Count I: Wage Act Violations

The Wage Act "provides a cause of action for loss of wages and other benefits." McAleer v. Prudential Ins. Co. of America, 928 F. Supp. 2d 280, 287 (D. Mass. 2013).  To prevail on a Wage Act claim, Plaintiff must prove that (1) he was an employee under the statute, (2) his compensation constitutes a wage under the statute, and (3) the defendants violated the Wage Act by not paying him his wages in a timely manner.  Stanton v. Lighthouse Fin. Servs., Inc., 621 F. Supp. 2d 5, 10 (D. Mass. 2009).

The Wage Act generally does not apply to discretionary bonuses, but does protect commission payments that are "due and payable" and "arithmetically determinable." Levesque v. Schroder Inv. Mgmt. N. Am., Inc., 368 F. Supp. 3d 302, 313 (D. Mass. 2019) (quoting Okerman v. VA Software Corp., 871 N.E.2d 1117, 1124 (Mass. App. Ct. 2011)); see also Mass. Gen. Laws ch. 149, § 148.  Commissions are due and payable when "any contingencies relating to their entitlement have occurred."  McAleer, 928 F. Supp. 2d at 288 (quoting Sterling Research, Inc. v. Pietrobono, No. 02-cv-40150, 2005 WL 3116758, at *11 (D. Mass. Nov. 21, 2005)).

---

[5] The parties largely raised these same arguments during trial in their competing motions for judgment on the partial findings.  [ECF Nos. 194, 200].

i.     Threshold Issues

As a preliminary matter, Defendants assert that Plaintiff's Wage Act claims for 2015 and 2016 are time-barred.  [ECF No. 222 at 5, 28–30].  "[T]he Wage Act, which requires employers to make timely payment of wages to employees . . . has a three-year statute of limitations." Crocker v. Townsend Oil Co., Inc., 979 N.E.2d 1077, 1082 (Mass. 2012).  Under the language of the Agreement, Plaintiff's 2015 commissions were due and payable on or before February 29, 2016, and his 2016 commissions were due and payable on or before March 1, 2017.  [Ex. 3 ¶ 4(d)(i)].

The parties agree that Plaintiff's claims are tolled for five days to account for the time between the filing of his complaint with the AGO, on March 6, 2019, and the date the AGO issued a letter authorizing a private right of action, on March 11, 2019.  See Mass. Gen. Laws ch. 149, § 150; Scarpaci v. Lowe's Home Ctr., LLC, 212 F. Supp. 3d 246, 250 (D. Mass. 2016); [Ex. 8].

Accordingly, as to 2015, Defendants argue that the last date by which Plaintiff could have filed a timely Wage Act claim for his commission was March 6, 2019, but that he did not bring this claim until April 15, 2019.  [ECF No. 222 at 28–30; ECF No. 195 at 4–5].  Plaintiff, however, contends that the time to file his claims was further tolled by the Massachusetts "discovery rule."  See Crocker, 979 N.E.2d at 1083; [ECF No. 197 at 4–6].  Under the discovery rule, limitations periods run from the time a plaintiff discovers, or reasonably should have discovered, the underlying harm (here, both the late payment of commissions and the underpayment, or non-payment, of commissions) for which relief is sought.  Crocker, 979 N.E.2d at 1083; see also In re Sheedy, 801 F.3d 12, 20 (1st Cir. 2015).  The evidence supports that Plaintiff could not have known that he would not be paid any commissions in 2015 until he received an email from Spivak on April 19, 2016.  [May 4 Tr. 32:12–33:7; Ex. 40].  Inclusive of

the five-day tolling period provided by Mass. Gen. Laws ch. 149, § 150, the statute of limitations on Plaintiff's Wage Act claim for his 2015 sales commission lapsed no earlier than April 19, 2019. He filed this complaint on April 15, 2019. [ECF No. 1]. Accordingly, the complaint for unpaid commissions is timely. But, to the extent Plaintiff seeks a separate claim for late-paid wages, such a claim would be time-barred because Plaintiff knew by March 6, 2019 that his commission payment was late.[6]

As to 2016, Defendants' argument that the 2016 Wage Act claim is untimely is also unavailing because those claims sufficiently relate back to the original complaint, which was filed well-within the statute of limitations applicable to the 2016 claims. Massachusetts' "liberal rules governing the amendment and relation back of pleadings," Herrick v. Essex Reg. Ret. Bd., 861 N.E.2d 32, 35 (Mass. App. Ct. 2007), allow for new claims to "relate[] back" to earlier pleadings where the claims "ar[ises] out of the [same] conduct, transaction, or occurrence[,]" Mass. R. Civ. P. 15(c). Defendants complain that Plaintiff never explained his reason for not including the 2016 claims in the original complaint, [ECF No. 222 at 29–31], but "[t]he addition of new claims to an amended pleading does not alone defeat relation back; the question instead is whether the initial pleading provided a defendant with adequate notice of the potential new claims[,]" Quaak v. Dexia, S.A., 445 F. Supp. 2d 130, 137 (D. Mass. 2006). Here, it is undisputable that Plaintiff's initial pleading provided Defendants with "adequate notice of the potential new claims" as the Defendants' wage and commission payment practices were the

---

[6] The Court agrees with Plaintiff that Defendants' reliance on Reuter v. City of Methuen, 184 N.E.3d 772 (Mass. 2022) (or any of the other cases cited by Defendants) for the contention that the discovery rule does not apply to Wage Act claims, see [ECF No. 195 at 5–9; ECF No. 197 at 4–5], is entirely unfounded, as the decision makes no mention of the statute's three-year limitation or the discovery rule, much less reaches conclusions about its application to the Wage Act.

entire subject matter of that first complaint.  Id. at 137.  Finally, Defendants suggest that the 2016 Wage Act claim must be denied because Plaintiff did not file a second complaint with the AGO after amending his complaint, [ECF No. 195 at 9–10], but do not provide any authority for this assertion.  Plaintiff's AGO complaint for general unpaid wages during his employment with Grove adequately satisfied the purposes of the requirement, namely notifying the AGO of the alleged violations prior to suit.  See Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1061 (Mass. 2013).

ii.        2016 Wage Act Claim

The Wage Act states that employees claiming to be aggrieved by a violation of § 148 of the Act are entitled to "damages incurred, and for any lost wages and other benefits."  Mass. Gen. Laws ch. 149, § 150.  Though the Wage Act "'impose[s] strict liability on employers,' who must 'suffer the consequences' of non-compliance regardless of their intent," Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018) (quoting Dixon v. City of Malden, 984 N.E.2d 261, 265 (Mass. 2013)), Plaintiff must still prove damages to be entitled to recovery, Hogan v. InStore Grp., LLC, 512 F. Supp. 3d 157, 174 (D. Mass. 2021); cf. Awuah v. Coverall N. Am., Inc., 740 F. Supp. 2d 240, 243 (D. Mass. 2010) (stating that plaintiff, who was misclassified as an independent contractor under the Wage Act, was only entitled to "damages incurred" directly from the misclassification); Somers v. Converged Access, Inc., 911 N.E.2d 739, 751 (Mass. 2009) (stating that "'damages incurred' will include any wages and benefits the plaintiff proves he was denied because of his misclassification as an independent contractor").

The question then is whether Plaintiff has proven damages, which in this case, are lost commissions in 2016.  The Court finds that he has proven that he incurred damages of $101,093.00 in late wages and $6,759.00 resulting from the improper contribution to his 401(k), but that he has not proven that he was otherwise underpaid wages for 2016.

It is undisputed that the $101,093.00 in commissions that he was paid for calendar year 2016 was paid after the deadline provided in the Agreement.  [April 27 Tr. 44:18–23; May 6 Tr. 331:11–19, 334:21–35:3].  The Court further finds that the $6,759.00 deducted from his sales commission was an unpaid wage.  The 2016 summary provided by Grove explicitly states that the $6,759.00 sum was deducted from his calculated sales commission.  [Ex. 12].  The Agreement does not allow for such a deduction and, in light of the penalties generally incurred for early withdrawals of retirement accounts, see 26 U.S.C. § 72(t), Plaintiff was harmed by Defendants' decision to divert his commissions payment in that manner.

Though Plaintiff contends that he is entitled to another $146,538.00 in unpaid wages for 2016, he has not provided sufficient evidence to prove this claim.  He asserts that because Defendants unlawfully halved his commission rate, from 15 to 7.5 percent, he should be entitled to an additional $146,538.00 based on the commissions payout calculated by Grove for Plaintiff for 2016.  See [ECF No. 223 at 23]; see also [Ex. 12].  This payout calculation, however, did not include any of the deductions that are outlined in the Agreement, and without those estimations, Plaintiff has not demonstrated how much in wages he was actually owed in 2016 under the terms of the Agreement.  Plaintiff emphasizes that such a claim is actionable even where he earned more under the new commissions calculations system, see [ECF No. 223 at 21]; Sullivan v. Sleepy's LLC, 121 N.E.3d 1210, 1218 (Mass. 2019); Somers, 911 N.E.2d 739, and the Court does not disagree, but that is of no matter where Plaintiff has not proven that he was improperly compensated for his work, Donis v. Am. Waste Servs., LLC, 125 N.E.3d 759, 770 (Mass. App. Ct. 2019), aff'd in part, rev'd in part, 149 N.E.3d 361 (Mass. 2020).  Without even an estimate of

what deductions would have been properly allocated to Plaintiff in 2016, the Court cannot

speculate what those charges would be nor can it rely on the 2016 payout as a comparator.[7]

        iii.        <u>2015 Wage Act Claim</u>

The Court further finds that Plaintiff has not proven by a preponderance of the evidence

that he was owed any commissions in 2015.

Plaintiff avers that Defendants unlawfully avoided paying him his earned commissions in

2015 by attributing to him cost of capital and overhead charges not limited to Grove's Atlanta

office as dictated by the Agreement and by calculating his overhead allocation based on the gross

profit method, rather than using a net metric ton approach.  <u>See</u> [ECF No. 223].

There is no doubt that the language of the contract with regard to the Atlanta office is

unambiguous.  Where a contract is unambiguous, the contract is to be interpreted "according to

its plain terms."  <u>Wipro Ltd. v. Analog Devices, Inc.</u>, 527 F. Supp. 3d 93, 98 (D. Mass. 2021)

(quoting <u>Den Norske Bank AS v. First Nat. Bank of Boston</u>, 75 F.3d 49, 52 (1st Cir. 1996)).

Nevertheless, contract interpretation "'depends heavily on context' and proceeds on the

presumption that 'the parties were trying to accomplish something rational.'"  <u>Id.</u> at 98 (first

quoting <u>McAdams v. Mass. Mut. Life Ins. Co.</u>, 391 F.3d 287, 299 (1st Cir. 2004), then quoting

<u>Fishman v. LaSalle Nat'l Bank</u>, 247 F.3d 300, 302 (1st Cir. 2001)).  "Common sense is as much

a part of contract interpretation as is the dictionary or the arsenal of canons."  <u>Fishman</u>, 247 F.3d

at 302.  "Thus, a contract should be interpreted in a manner that avoids absurd results and

'give[s] it effect as a rational business instrument.'"  <u>Widpro</u>, 527 F. Supp. 3d at 98 (quoting

---

[7] Notably, earlier in this litigation, Plaintiff's motion to amend the complaint to add Wage Act claims for 2016 was granted with the caveat that he could not take further written discovery. [ECF No. 41].  Plaintiff's expert did not opine on any unpaid commissions for 2016.  <u>See generally</u> [Ex. 13].

<u>Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.</u>, 99 N.E.3d 744, 754 (Mass. 2018) (internal quotation omitted) (alteration in original)).

While the Agreement specifies that those particular charges against Plaintiff's commission calculation be calculated only as to the "Atlanta office," the evidence supports that the Defendants never calculated Plaintiff's deductions in this matter, including in the years for which he is not seeking relief; that the parties never intended that deductions be calculated in that way; and that any attempt to do so is impracticable in light of the structure of Grove's business. Indeed, what is clear from the evidence is that Grove likely never calculated Plaintiff's commissions exactly in line with the Agreement—foregoing performance hurdles and cost of capital, for example—but, in this particular year, unlike in some other years, Plaintiff did not benefit from those deviations.

The evidence presented at trial demonstrates that reading the contract to limit these allocations to the Atlanta office would be irrational and inaccurate because Plaintiff necessarily used Grove resources beyond the Atlanta office to conduct his trading business, including the resources of other affiliates and entities.  [Apr. 27 Tr. 20:9–21:14; May 2 Tr. 140:20–141:3].  In fact, the parties agreed that a literal reading of the "proportionate share" language in the Agreement would impose on Plaintiff the entire overhead, and all costs and expenses of the Atlanta office, which was not their intention.  [May 2 Tr. 121:17–122:22; May 4 Tr. 11:14– 12:5].  Moreover, both Wacek and Gordon testified that this overheard sum would be the same whether the calculation was made by first determining Plaintiff's relative share of Grove's overall operations or by first allocating the share of Grove's overall costs to the Atlanta office and then determining Plaintiff's share of those costs.  [Ex. 14 at 7].  Given the intent of the parties, the structure of Grove, and how Plaintiff used all of Grove's operations and resources in

the course of his business, including other affiliates and entities, Plaintiff has not proven by a preponderance of the evidence that it was unreasonable for Grove to include costs and revenue from affiliate operations in calculating his proportionate share for commission purposes.[8]

Nor has Plaintiff proven by a preponderance of the evidence that the gross profit method was an unreasonable way to calculate his proportionate share of overhead.  Though Plaintiff's expert opined on the propriety of the net metric ton method for this calculation, Defendants provided sufficient evidence that the gross profit method was also a reasonable approach, which is all the Agreement requires.  See [Ex. 3 ¶ 4(d)(ii) ("[A]ll calculations of proportionate amounts of such costs shall be made by the Company in accordance with *any* reasonable allocation method selected by the Company." (emphasis added))].  Defendants supported their decision to use this method with testimony from Spivak, Gordon, and a qualified expert witness, all of whom talked about why they chose the gross profit method based on the nature of the business and the business's objectives.  Defendants' expert further rebutted Plaintiff's expert's determinations and concluded that Plaintiff was not due commissions under either of the methods used by Plaintiff's expert when proper adjustments were made to his calculations.  Plaintiff was undoubtedly dealt a frustrating and perhaps even unfair hand in that his personal success came in a year where the company was less successful, depriving him of the financial gain he anticipated.  This alone, however, does not put Defendants' calculations outside the bounds of the Agreement, which gave Grove the broad authority to calculate costs "in accordance with any reasonable allocation method selected by the Company."  [Ex. 3 ¶ 4(d)(ii)].

---

[8] Gordon also testified that as part of Grove's annual calculation of overheard, it identified personal expenses, such as family cell phone bills, but these expenses were removed from the overhead calculation and separately charged to the responsible employee.  [May 6 Tr. 250:3–251:2].

### B.      Count II: Breach of Contract

In Massachusetts,

> [t]o prevail on a claim for breach of contract, a plaintiff must demonstrate that there
> was an agreement between the parties; the agreement was supported by
> consideration; the plaintiff was ready, willing, and able to perform his or her part
> of the contract; the defendant committed a breach of the contract; and the plaintiff
> suffered harm as a result.

Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016) (citing Singarella v. Boston, 173

N.E.2d 290, 291 (Mass. 1961)).  Accordingly, Plaintiff cannot succeed on a breach of contract

claim if he is unable to prove that he has been damaged by Grove's breach.  Haven Real Est.

Grp., LLC v. Bell Atl. Mobile of Mass. Corp., Ltd., 236 F. Supp. 3d 454, 464 (D. Mass. 2017)

(granting summary judgment on breach of contract claim when there was no evidence that

plaintiff suffered any damages).

For the reasons discussed above, the Court finds that Grove did not breach the Agreement

for the year 2015 and that, for 2016, Grove is liable for breach due to late-paid commissions and

the 401(k) contribution, but not due to additional lost wages because Plaintiff has not provided

sufficient evidence of damages—and the standard for common law breach of contract is even

more demanding.

Plaintiff also brings breach of contract claims for late payment of wages in 2014 and

another alleged improper 401(k) deduction from his sales commission in 2014.  Because Plaintiff

has failed to provide any evidence of damages incurred as a result of Plaintiff's late payment of

the 2014 commissions, he is not entitled to judgment on that claim.

The Court does, however, find that Grove again breached the Agreement by making an

improper deduction from his sales commission to fund his 401(k), this time in the amount of

$7,041.00.  Although Plaintiff's 2014 bonus summary states only that the $7,041.00 deduction

was taken from his total bonus amount, which included both his sales commission and his

management bonus, see [Ex. 10], and Gordon testified that the 2014 401(k) contribution came

from the management bonus and not commissions, [May 6 Tr. 256:21–257:1], all surrounding

evidence indicates otherwise.  In 2016, when Plaintiff was not paid a management bonus,

Grove's own document explicitly states that the 401(k) sum came out of his sales commission,

see [Ex. 12], and again in 2015, Grove own's document indicates a potential 401(k) deduction

from Plaintiff's sales commissions (though it is not clear from the evidence whether this

contribution was actually made), see [Ex. 2].  Altogether, the evidence leans towards the

conclusion Grove funded the 401(k) contribution for all three years by improperly deducting it

from Plaintiff's total sales commissions.

## V.      DAMAGES

Pursuant to the findings above, the Court finds that Plaintiff is entitled to $107,852.00 in

unpaid or late wages for 2016.  This number is subject to mandatory trebling under the Wage

Act, see Mass. Gen. Laws ch. 149, § 150; McGrath v. City of Somerville, 419 F. Supp. 3d 233,

262 (D. Mass. 2019), bringing the total to $323,556.00, plus reasonable attorney's fees and costs.

Mass. Gen. Laws ch. 149, § 150. Plaintiff is further entitled to $7,041.00 in damages resulting

from the breach of contract related to his 2014 wages.[9]

---

[9] Plaintiff is also entitled to prejudgment interest on his claims beginning on the date this action
was commenced, except for the trebled portion of the Wage Act claims.  Mass. Gen. Laws ch.
231, § 6C ("In all actions based on contractual obligations, upon a[n] . . . order for judgment for
pecuniary damages, interest shall be added by the clerk of the court to the amount of damages . .
. at the rate of twelve per cent per annum from the date of the breach or demand.").  Under
Massachusetts law, "statutory prejudgment interest pursuant to G. L. c. 231, § 6H, shall be added
by the clerk of court to the amount of lost wages and other benefits awarded as damages pursuant
to G. L. c. 149, § 150, but shall not be added to the additional amount of the award arising from
the trebling of those damages as liquidated damages."  George v. Nat'l Water Main Cleaning
Co., 77 N.E.3d 858, 860 (Mass. 2017); see also St. Pierre v. CVS Pharmacy, Inc., 265 F. Supp.
3d 131, 142 (D. Mass. 2017).

**VI.     CONCLUSION**

For the reasons discussed herein, Plaintiff is entitled to recover for Defendants' Wage Act violations and breaches of contract.  The motions for judgment on the partial findings, [ECF Nos. 194, 200], are moot.

Judgment shall enter as follows:

- For Count I:

  o   Judgment shall enter for Defendants for the 2015 claim.
  o   Judgment shall enter for Plaintiff in part and for Defendants in part for the 2016 claim.

- For Count II:

  o   Judgment shall enter for Grove for the 2015 claim.
  o   Judgment shall enter for Plaintiff in part and for Grove in part for the 2016 claim.
  o   Judgment shall enter for Plaintiff in part and for Grove in part for the 2014 claim.


**SO ORDERED.**

February 22, 2023                                    /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE